MORPUL, INC.

v.

CRESCENT HOSIERY MILLS.

MORPUL, INC.

v.

TENNESSEE HOSIERY MILLS COMPANY, Inc.

MORPUL, INC.

v.

D. C. McCONKEY t/a Allied Hosiery Mills.

MORPUL, INC.

v.

R. B. EAST t/a Engleknit Hosiery Mills.

MORPUL, INC.

v.

William P. CHESNUTT and Niota Textile Mills Co.

Civ. A. Nos. 3817–3821.

United States District Court
E. D. Tennessee, S. D.

Jan. 12, 1967.

McNeill Smith, John J. Dortch, David Rabin, Greensboro, N. C., U. L. McDonald, Chattanooga, Tenn., for plaintiff.

Harry Price, New York City, Richard P. Jahn, Chattanooga, Tenn., Kenneth D. Higgins, Athens, Tenn., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**FRANK W. WILSON, District Judge.**

These five lawsuits arise under the patent laws of the United States and involve, among other matters, the validity and infringement of certain patents owned by the plaintiff, Morpul, Inc. The issues raised in each of the five cases, other than infringement, are substantially identical. The Court has accordingly consolidated the cases for trial. Even when consolidated, however, there remain a large number of issues for decision. The validity of each of four patents is in issue, with 72 patents being cited as prior art, along with other prior art testimony. Infringement of three of these patents, having a total of 21 claims, by each of the six defendants (two defendants being named in one suit) is alleged. In addition to non-validity and non-infringement, other defenses have been asserted by the defendants, including unclean hands and illegal monopoly, and a counterclaim alleging antitrust violations has been asserted. As will be noted, in the interest of a more orderly and manageable proceeding, the validity and infringement issues have been severed for trial from all other issues and these issues of validity and infringement are the only issues presently before the Court for decision. The trial of the validity and infringement issues extended over a period of approximately six weeks, the parties have filed quite voluminous briefs, and the case is now for decision by the Court upon the validity and infringement issues.

Prior to undertaking a statement of the findings of fact and conclusions of law, a summary of the respective contentions of the parties would be appropriate at this point.

The plaintiff, Morpul, Inc., contends that it is the owner of the entire right, title, and interest in and to United States Letters Patents: No. 2,420,771 issued on May 20, 1947, for knitting machine and method (the said patent being sometimes hereinafter referred to as No. '771 or as Crawford No. 1 patent); No. 2,466,885 issued on April 12, 1949, for a stocking (the said patent being sometimes hereinafter referred to as No. '885 or as the Floyd patent); and No. 2,716,876 issued on September 6, 1955, for apparatuses for knitting elastic fabric and methods (the said patent being sometimes hereinafter referred to as No. '876 or as the Surratt patent). The plaintiff also contends that it is the owner of Patent No. 2,473,677 issued June 21, 1949, for a knitting machine and method (the said patent being hereinafter sometimes referred to as Patent No. '677 or as Crawford No. 2 patent). Initially the plaintiff contended that this patent, too, was infringed by the defendants, but this claim was abandoned early in the history of these lawsuits. The plaintiff further contends that United States Letters Patent No. 2,420,771 (Crawford No. 1) is valid and that one or more of Claims 1, 2, 3 and 4 were infringed by the defendant, Allied Hosiery Mills, that one or more of Claims 1, 2, 3, 4 and 5 were infringed by the defendant, Engleknit Hosiery Mills, that one or more of Claims 1, 2, 3, 4 and 5 were infringed by the defendant Crescent Hosiery Mills, that

one or more of Claims 1, 2, 3, 4 and 5 were contributorily infringed by the defendant, Niota Textile Mills, and that one or more of Claims 1, 2, 3, 4 and 5 were contributorily infringed by the defendant, Tennessee Hosiery Mills Co. The plaintiff further contends that United States Letters Patent No. 2,466,885 (Floyd) is valid and that Claim 1 was infringed by the defendants, Crescent Hosiery Mills, Niota Textile Mills, and Tennessee Hosiery Mills. The plaintiff further contends that United States Letters Patent No. 2,716,876 (Surratt) is valid and that one or more of Claims 7, 11, 12, 13 and 14 were infringed by the defendant, Allied Hosiery Mills, that one or more of Claims 7, 9, 10, 11, 13 and 14 were infringed by the defendant, Engleknit Hosiery Mills, that one or more of Claims 9, 11 and 14 were infringed and one or more of Claims 7, 9, 10, 11, 13 and 14 were contributorily infringed by the defendant, Crescent Hosiery Mills, that one or more of Claims 7, 9, 11, 12, 13 and 14 were contributorily infringed by the defendant, Niota Textile Mills, and that one or more of Claims 7, 10, 11, 12, 13 and 14 were contributorily infringed by the defendant, Tennessee Hosiery Mills Co. The plaintiff contends that the defendants did intentionally conspire to destroy the value of plaintiff's patents and each of the defendants has on one or more occasions openly and deliberately attacked the validity of patents under which they were licensed, both before and after cancellation of their licenses from plaintiff; and the defendant willfully and deliberately produced and sold or had produced hosiery, employed apparatus and methods, and/or have induced others to employ apparatus and methods, and/or to make hosiery in infringement of one or more of the claims of one or more of plaintiff's patents; and one or more of the defendants have actively induced others to discontinue the use of plaintiff's patents, thereby interfering with the contractual relationships between the plaintiff and its licensees by asserting that plaintiff's patents were invalid or not infringed. The plaintiff seeks to have this Court (1) declare the aforesaid patents valid and infringed, (2) award treble damages for the willful and deliberate acts alleged to have been committed by the defendants, (3) order an accounting for all goods shipped which infringe upon any of the aforesaid claims of the aforesaid patents or in the manufacture of which any persons or firms were induced by the defendants, or any of them, to infringe any of said patents, and (4) issue appropriate injunctive relief.

The defendants do not admit that the plaintiff holds the three patents claimed to have been infringed, and deny that the patents are valid or that any of the claims of the patents were infringed. The defendants claim that each and every claim of the four Morpul patents (including No. 2,473,677 (Crawford No. 2) issued on June 21, 1949, for knitting machine and method which the plaintiff originally claimed as infringed) are invalid over prior patents, prior uses, and prior inventions, not known to the patent office at the time of issuance thereof and that the four patents are therefore not valid patents. Defendants further deny that they have infringed any claim of one or more of the Morpul patents. The defendants further contend that the plaintiff is barred from relief because of its unclean hands, its breach of contract, and its violation of antitrust laws of the United States.

By way of counterclaim the defendants contend that the plaintiff has been and still is attempting to maintain an illegal monopoly in interstate commerce by endeavoring to maintain control over the manufacture, use and sale of elastic top socks. The defendants contend that the plaintiff has been and still is carrying on the following activities: (1) improperly alleging that the defendants' suppliers and customers are subject to patent infringement actions if they continue to supply or buy from the defendants; (2) improperly claiming that it has a monopoly in interstate and intrastate commerce upon certain knitted stockings and that such stockings could be manufactured, sold or used only with

the consent and license of the plaintiff; (3) improperly claiming that it has patents covering machines and construction in connection with certain socks and stockings without specifying the nature or claims alleged to be infringed; (4) improperly claiming that any use, purchase, sale, or finishing of certain socks or stockings would constitute contributory infringement of its patents without specifying the exact character of such; (5) improperly seeking to cause all elastic or stretch-top hosiery manufacturers as well as finishers to pay royalties and license fees to the plaintiff; (6) by improperly giving the impression to the trade that plaintiff's patents had a broad scope and coverage and by further improperly claiming broad trademark coverage; and (7) by improper use of confidential matters. The defendants further contend that the plaintiff entered into a conspiracy by itself or with others to effect an illegal monopoly in interstate and intrastate commerce in elastic-top socks and has sought to secure royalties or tribute by threatening patent infringement suits. The defendants contend that they are entitled to (1) have the four patents declared invalid and not infringed, (2) appropriate injunctive relief, and (3) damages.

The plaintiff, Morpul, Inc., for answer to the defendants' counterclaims, denies each and every allegation that it was guilty of any illegal activities or improper conduct which would subject it to any liability to the defendants as alleged. In addition to the foregoing, and while these lawsuits were pending, a separate action was commenced in another jurisdiction by Morpul, Inc., against Tennessee Hosiery Mills Co., Inc., and Niota Textile Mills Company, Inc., for collection of patent royalties alleged to be due under the foregoing patents at a time when the said defendants were licensees under the patents. The named defendants sought to have this Court enjoin the proceedings for patent royalties in the other jurisdiction and to avoid a multiplicity of actions, the action for royalties was joined by amendment to the present lawsuits, the amendment being made under the ancillary jurisdiction of this Court.

As noted above, the trial of all issues relating to validity and infringement was severed from the remaining issues and a trial was held upon these issues only, the trial having commenced upon May 10, 1965, and having been completed upon June 30, 1965. The Court accordingly enters the following findings of fact and conclusions of law upon the issues of validity and infringement.

## FINDINGS OF FACT
### The Parties

(1) The plaintiff, Morpul, Inc., is a North Carolina corporation having its principal office and place of business in Greensboro, North Carolina. Its principal business is the ownership and licensing within the hosiery industry of the subject patents, along with certain trademarks, including the trademark "Morpul".

(2) In Civil Action No. 3817, the defendant, Crescent Hosiery Mills, is a Tennessee corporation having its principal office and place of business at Niota (McMinn County), Tennessee. William H. Burn is an officer in Crescent and was a witness in behalf of Crescent upon the trial. Crescent conducts both the knitting and finishing of socks. In addition, it takes all of the greige (unfinished) goods produced by Raymond B. East, trading as Engleknit Hosiery Mills, and finishes and markets the same. Upon occasions it appears that Crescent has sold greige (unfinished) goods to Niota Textile Mills Company, which in turn finished and marketed them.

(3) In Civil Action No. 3818, the defendant, Tennessee Hosiery Mills Company, Inc., is a Tennessee corporation having its principal office and place of business at Englewood (McMinn County), Tennessee. At the time this action was brought, Tennessee was engaged only in the finishing of socks and obtained its greige (unfinished) goods from others, including the defendant, D. C. McConkey, trading as Allied Hosiery

Mills. Tennessee went out of business shortly after this lawsuit was instituted, and Niota Textile Mills Company, another defendant herein, appears to have taken over such portion of its business as survived. The principal stockholders and officers in both Tennessee and Niota were William P. Chesnutt and Walter Motter, Chesnutt himself being named defendant in the case along with Niota, and he having been a witness in the case both in his own behalf and in behalf of Tennessee and Niota.

(4) In Civil Action No. 3819, the defendant, D. C. McConkey, is an individual trading as Allied Hosiery Mills. The business is located at Englewood (McMinn County), Tennessee, where McConkey also resides. Subsequent to the filing of this action, Allied has become incorporated as Allied Hosiery Mills, Inc., a Tennessee corporation, and the corporation has taken over all of the assets and liabilities of the former proprietorship. Allied knit hosiery only in the greige and all of its production went either to Niota Textile Mills Company or to Tennessee Hosiery Mills Company, Inc., prior to that company having gone out of business.

(5) In Civil Action No. 3820, the defendant, R. B. East, is an individual trading as Engleknit Hosiery Mills. The business is located at Englewood (McMinn County), Tennessee, and Mr. East is a resident of Englewood. East produced hosiery only in the greige, selling all of his production unto the defendant, Crescent Hosiery Mills. Crescent furnished East with capital for his operation and was in substantial control of East's production of hosiery.

(6) In Civil Action No. 3821, two defendants are named, the defendant, William P. Chesnutt, being an individual residing in Athens, Tennessee, and Niota Textile Mills Company being a Tennessee corporation with its principal place of business located at Niota (McMinn County), Tennessee. Chesnutt is president of Niota and was vice president of Tennessee Hosiery Mills Company, Inc., prior to its going out of business. He sold socks for both. Niota finished socks only, obtaining its greige goods from others, including Allied Hosiery Mills (D. C. McConkey).

### Background

(7) Circular knitting machines for knitting tubular fabric of seamless construction, including hosiery and socks, have been manufactured since prior to 1900. Knitting instrumentalities on circular knitting machines include a cylinder, needles vertically movable in slots in the outer cylindrical surface of the cylinder, and sinkers over which the loops were formed as the needles lowered the yarns.

An understanding of sinker and needle action is particularly important to an understanding of the patents here in issue. The basic function of the sinkers is to form a knitting ledge over which the needles draw loops of yarn. By their configuration and their inward and outward motion sinkers also serve to position the knitting yarns (or elastic) and to assist in shedding loops once knit so as to avoid having the needles twice pass through loops previously knit. Accordingly, sinkers are located in a ring around the top of the needle cylinder, with sinkers and needles alternating and one sinker being located between each two needles. The configuration of the sinkers is that of three finger-like projections, one on top of the other, with the topmost projection being greatly abbreviated and described as the "nib" of the sinker. The two lower fingers are referred to as the "body" of the sinker and form the ledge upon which knitting is conventionally performed. The inward and outward motion of the sinkers, as well as the upward and downward motion of the needles, are each controlled by a series of cams, and together the needles and sinkers perform the circular knitting in the production of hosiery. As a matter of nomenclature which the Court may have occasion to use in addition to the terms hereinabove defined, that portion of the sinker where the ledges or fingers of the sinker, including

sinker nib, join the main body of the sinker (comparable to the joining of fingers in the palm of the hand) is referred to in the knitting industry as the "throat" of the sinker. A continuous succession of loops in a single row is referred to as a "course" and a vertical series of interconnected loops is referred to as a "wale", with the downward loops being the needle wale and the upward loops being the sinker wale.

(8) The tops of ladies' stockings and half-hose were generally provided with rib knit courses for increased fabric stretchability to avoid, if possible, binding and constricting action of the leg when the stocking or sock was worn. In socks (half-hose) string knitting was utilized in which a series of consecutive sock rib knit tops were formed on a circular knitting machine. These individual rib knit tops were manually cut from a continuous seamless tube and manually transferred, by a laborious loop transferring operation called "topping", to a plain knit circular knitting machine using a single set of needles which would then knit the remainder of the sock. The resulting sock, formed in two separate operations, included a cuff or garter top portion that was substantially self-sustaining, in an elevated position on the leg of the wearer. Representative of this type of string knitting and rib top in which rubber yarn was laid in is the Riggs Patent 2,039,932 of May 5, 1936. A greatly enlarged rib knitting machine was employed having an enlarged cylinder in which rubber was fed under high tension to contract the fabric being knit. The rib top formed as taught by Riggs was then transferred to a plain knit machine for completion of the sock using plain normal length stitches below the rib knit double faced fabric formed using two sets of needles.

(9) Efforts to produce an integrally knit, self-supporting elastic top sock using a single set of needles on a circular knitting machine were unsuccessful until the late 1930's and early 1940's. The Davis Company of Chattanooga, Tennessee, acquired the patent rights of Robert E. Davis and James L. Getaz which patents included, among others, Patents 2,306,246; 2,230,402; 2,171,236; 2,168,-869 and 2,054,217, which covered rubber top socks, machines and methods for making rubber top socks. The Davis and Getaz patents acquired by The Davis Company were licensed to the hosiery industry on a non-exclusive basis upon royalties to be paid for the use of the numerous licensed patents which covered the knitting of a plain knit sock on a circular knitting machine in which only a single set of needles were employed. Substantially uniform stitches were knit throughout the entire sock and a mock-rib garter top was formed by knitting in or laying in elastic yarn under heavy tension to contract the garter top. The elastic top of the Davis patents eliminated the necessity for separate gartering. Initially socks or half-hose produced under the Davis and Getaz patent, as well as other patents relating to the knitting in or laying in of rubber or elastic yarn, tended to be tight and binding upon the leg of the wearer. The knitted stitches in the garter band portion containing elastic were of substantially the same length as the stitches in the leg or foot portion having no elastic. The fabric in the garter band portion thus often had no greater stretchability than did the fabric in other portions of the sock.

(10) In 1945 Cecil Crawford and his brother, Herman Crawford, residents of North Carolina who had each been engaged for a number of years in the knitting industry and had manufactured and sold circular knitting machines and knitting machine attachments, submitted an application for a patent, which application was eventually granted as Patent No. 2,420,771 (Crawford No. 1). The subject matter of the patent was a knitting machine and method for knitting rubber top socks having a looser fabric in the cuff portion than in the foot or leg portion. Basically this was accomplished, as will be more fully discussed hereinafter, by knitting the cuff portion of the sock over the "nib" or topmost

ledge of the sinker, whereas the leg and foot portion of the sock was knit upon the body or lower ledge of the sinker as had generally been the procedure for knitting both the cuff and the foot portion. Application for this patent was made upon November 30, 1945, and the patent was granted upon May 20, 1947.

(11) Upon July 16, 1946, and at a time when the '771 (Crawford No. 1) patent was still pending, Cecil Crawford and Herman Crawford made application for a further patent, which application was eventually granted as Patent No. 2,473,-677 (Crawford No. 2). This patent was not granted, however, until June 21, 1949, some two years after the granting of '771 (Crawford No. 1). The subject matter of Patent No. '677 (Crawford No. 2) was a knitting machine and method for knitting a rubber top sock having a looser fabric in the cuff portion than in the foot or leg portion, and at the same time achieving a pattern or simulated rib effect. Basically this was accomplished by a combination of "over the nib" knitting, as set forth in Crawford No. 1 ('771) and a pattern drum, a device old to the knitting industry. Application for this patent was made upon July 16, 1946, and the patent was granted upon June 21, 1949.

(12) Sometime thereafter Morpul, Inc., was organized with Cecil Crawford as president and chairman of the board and Herman Crawford as vice president and the above patents (Crawford No. 1 and No. 2) were sold and assigned unto Morpul, Inc. Morpul, Inc., commenced a non-exclusive patent licensing program in 1952 by licensing hosiery mills upon a uniform royalty basis of five cents per dozen pairs, the royalty to be paid either by the knitter or the finisher, but with only one royalty to be paid. At the same time Morpul, Inc., specified certain standards of quality control in the license agreement and developed the trademark "Morpul", the use of which was also included within the license. Licensees were required to submit new sock constructions under the license for approval by Morpul. Over the next several years

Morpul was successful in licensing some 300 hosiery mills. There was testimony to the effect that at the time of this lawsuit Morpul had collected in excess of $3,000,000 in royalties under the licensing program.

(13) In the meanwhile, one E. T. Floyd had succeeded in getting a patent upon a loose top elastic sock, this being the Floyd Patent No. 2,466,885. In fact, Floyd had submitted his patent application upon August 14, 1945, some three months prior to the Crawford No. 1 ('771) application. Unlike the Crawford machine and method patent, however, the subject matter of the Floyd patent was an article or product patent upon a sock having a loose knit fabric in the cuff portion with elastic or rubber laid in and not knit in. The basic claim in the patent is to a sock having a length of yarn in each knitted loop of the cuff portion of the sock "at least twice" or "several times" the length of yarn in each knitted loop of the leg or foot portion of the sock. The lengthening of the loop in the cuff in proportion to the length of the loop in the leg or foot portion of the sock was to be accomplished by adjustments available upon known knitting machines adapted to produce so-called terrycloth fabric. The Floyd patent was eventually granted upon April 12, 1949, but not until after it had been denied by the patent examiner upon three occasions and numerous amendments had been made.

In 1955 Morpul, Inc., acquired the Floyd patent by purchase and assignment, contending that it was doing so to protect its licensees from possible infringement action under the Floyd patent in view of the fact that machines operating under the Crawford No. 1 and No. 2 patents could, but need not necessarily, produce a sock having a loop in the cuff in excess of twice the length of the loop in the body portion of the sock. Thereafter, Morpul, Inc., included the Floyd patent within the license agreement without any additional royalty from the licensees.

(14) In 1954 one Julian Surratt, being experienced in the hosiery knitting in-

dustry and having become aware of the Crawford method of "over the nib" knitting to produce an elongated stitch in the cuff while laying in elastic, set about to accomplish the same result by another method. Instead of knitting over the nibs to produce an elongated stitch in the cuff, Surratt conceived the idea of drawing the needles lower with reference to the body of the sinker while laying in elastic, thereby accomplishing the same result of producing a sock with a fabric in the cuff looser than the fabric in the leg or foot portion of the sock. The means used by Surratt to accomplish the additional lowering of the needles while knitting the cuff was to insert an auxiliary cam in such manner as to extend the regular stitch cam and thereby draw the needles lower than would be the case were only the regular stitch cam used. Surratt made application for a machine and method patent upon April 26, 1954, and the patent was granted upon September 6, 1955, this being Patent No. 2,716,876. He eventually sold and assigned this patent unto Morpul for $3,-000.00. Thereafter Morpul, Inc., included the Surratt patent within the license agreement without any additional royalty from the licensees.

(15) Between 1954 and 1958 each of the defendants, other than William P. Chesnutt, who is sued only as a contributory infringer, obtained a license from Morpul, Inc., permitting them to practice the Crawford No. 1 and No. 2 patents ('771 and '677). Although the licenses were obtained under the threat of possible infringement action in some cases, there was no evidence of illegal duress compelling any defendant to obtain a license from the plaintiff. Thereafter the defendants (other than Chesnutt) each remained licensees of Morpul until cancellation of their licenses in November 1961 under the circumstances hereinafter related. As such time as Morpul acquird the Floyd and Surratt patents, Morpul notified the defendants that these patents were included within their license rights without any additional royalty. (In this regard the unusual conten-

tion is made on behalf of the defendants that they never accepted the grant of the license to the Floyd and Surratt patents and accordingly were never licensees under these patents. In view of the conclusions hereinafter reached by the Court, it is not necessary to give further consideration to this contention).

During the period of their respective licenses, the defendants periodically submitted sock samples for approval, submitted regular reports unto the plaintiff, and those responsible paid royalties, all in accordance with the license agreement.

(16) In the summer of 1961 a controversy arose between Morpul, Inc., Niota Textile Mills Co., Inc., and Niota's greige knitters in regard to changes made by these licensees in the construction of certain styles which had theretofore been submitted to and approved by Morpul, Inc., for production under the license agreement. This controversy led to exchanges of telegrams and letters and to conferences in which issues were raised as to various alleged breaches of the license and alleged invalidity and non-infringement of the patents. Other defendants were drawn into the controversy with the defendants taking the position that they were being required to pay royalty upon socks manufactured in the same manner as was practiced by them prior to World War II. The defendants requested the plaintiff to advise them in what respect their knitting machines, method of knitting and socks practiced the plaintiff's patents. An inspection was arranged. The results of the inspection were inconclusive, however, with Morpul failing to advise the defendants of any conclusions reached as a result of the inspection and with the defendants interpreting the plaintiff's action in failing to report upon the inspection as confirming that no further royalties should be paid under the license agreement except upon socks using the Morpul trademark. Counsel for the defendants advised the plaintiff of this position by letter dated October 25, 1961. Treating this letter as an anticipatory breach of the license agreement by each

of the licensed defendants, the plaintiff mailed a notice of cancellation of the license agreement unto each defendant under date of November 8, 1961. These notices of cancellation were received by the defendants in due course of the mail. The notice of cancellation by its terms was to be effective as of November 8, 1961, the date upon which it was deposited in the mails by the plaintiff at Greensboro, North Carolina. Cancellation purported to have been made in accordance with Paragraph 11 of the license agreement, which provides as follows:

> "Upon any failure of Licensee to make returns or to make payments of royalties as herein provided, Licensor may terminate this license by mailing a written notice to Licensee; but Licensee shall not thereby be discharged from any liability to Licensor for any royalties due at the time of the mailing of such notice. Failure of Licensor to terminate this agreement for any default or breach shall not be deemed a waiver of the right to do so upon any other default or breach, either of the same or different character."

The present lawsuits seeking injunctive and other relief for alleged infringement by each of the defendants were filed upon the following day, November 9, 1961, at 11:00 A.M.

### Jurisdiction

(17) The plaintiff's complaints allege infringement of its patents by each of the defendants. Jurisdiction is alleged to lie with this court under the patent laws of the United States. (28 U.S.C. § 1338 and 35 U.S.C. §§ 271, 283 and 284) At the trial a further contention was made that diversity jurisdiction would lie in these actions, but no allegations of such jurisdiction were made in the complaints. In fact, the complaints as originally filed contained language which might be construed as alleging an action for breach of the license agreement by each defendant, but this language was stricken from the complaints upon the plaintiff disclaiming any intent to seek relief other than by way of infringement.

The defendants have at all times denied jurisdiction, contending that no valid cancellation of their licenses had been made as of the date of the filing of these lawsuits and that no action for infringement would accordingly lie as of such date. It is the further contention of the defendants in this regard that no grounds existed for cancellation of their licenses by the plaintiff as of November 8, 1961, the date the plaintiff attempted cancellation, and that in any event the notice of cancellation would not have become effective as of the date of mailing, but only when received by each defendant, which the evidence shows to have occurred some day or days subsequent to November 9, 1961, the date of filing of these lawsuits.

The pertinent facts in this regard, in addition to those set forth above in Paragraph 16 relating to the reasons for cancellation, the provisions for cancellation contained in the license agreement, and the mailing of the notices of cancellation, are that the complaints do allege cancellation of the license agreement and do allege infringement or contributory infringement by each defendant after the date of cancellation and prior to the filing of the lawsuits. Thus, an action for infringement is alleged in each lawsuit. The defendants have, of course, denied any such infringement in their answers, asserting as one ground for non-infringement the contention that they remained licensees as of the date of the filing of these lawsuits.

### Validity

(18) As patents may become prior art as of the date of the filing of the patent application, it would be appropriate to take up the patents whose validity is here in issue in the order of their respective filing dates. Thus, the validity of the patents will be considered in the following order: No. 2,466,885 (Floyd); No. 2,420,771 (Crawford No. 1); No. 2,473,677 (Crawford No. 2); and No. 2,716,876 (Surratt).

The requirements of novelty, usefulness, and non-obviousness, as set forth in 35 U.S.C. §§ 101, 102, and 103, and as further elucidated in pertinent case authority, all as more fully discussed hereinafter in the Court's conclusions of law, will govern the order in which the evidence will be reviewed upon the validity issues. In reviewing prior art and in determining the presence or lack of obviousness, the Court will of course bear in mind the requirement that unobviousness must be judged in the light of the state of the art at the time of the application for the respective patent and not in the light of the disclosures made in the patent itself or in the light of subsequent developments. Each of the patents whose validity is here in issue is a combination patent, that is, it is a combination of known elements which when combined allegedly accomplish a new, inventive, and patentable function or result. The rules governing combination patents must accordingly be kept in mind. Finally, the presumption of validity arising from the granting of a patent, which presumption has now been given statutory recognition (35 U.S.C. § 282), must at all times be borne in mind.

(19) In support of the validity of the patents, the plaintiff, in addition to relying upon the statutory presumption of the validity and other evidence of the validity, relies principally upon the testimony of the witness, Paul D. Bell, a patent attorney having some 16 years experience. A substantial portion of Mr. Bell's experience has been in the field of the knitting arts. He was at the time of the trial a member of the law firm which had prepared and filed the applications for the two Crawford patents and the Surratt patent, although he had not personally participated in the submission of the two Crawford patents.

In opposing the validity of the patents, the defendants rely principally upon the testimony of the witnesses, William Shinn, a professor of knitting technology at the School of Textiles, North Carolina State University, and Nathan Levine, a patent attorney and former assistant patent examiner in the United States Patent Office. His experience was largely in the field of the knitting arts. In addition, the defendants relied upon the witnesses, Frank Coile, who was experienced in the manufacture of hosiery knitting machines, and Goley Marlette, an officer with a large hosiery mill, each of whom gave testimony for the purpose of establishing prior use of the matters declared in Patent 2,716,876 (Surratt). Apart from the witnesses Coile and Marlette, the evidence of prior art introduced by each defendant consisted principally of prior patents.

(20) As hereinabove noted, the application for the Floyd Patent No. 2,466,-885 was first filed upon April 14, 1945. The application as originally filed made a disclosure of a sock having a normally stretchable foot and leg portion integrally knit with a garter band portion having abnormally elongated stitches and having elastic yarn laid in and not knit in the garter band portion. It was stated that the sock could be knit by known adjustments upon existing machines capable of producing a terry stitch. As reflected in the file wrapper, the Floyd application was rejected by the patent examiner upon three occasions before finally being granted. The first rejection was upon the ground that the disclosure and claims in the application were not inventive over prior art, particularly as shown in Fregeolle Patent No. 2,323,988 and in Green Patent No. 2,315,119. An attempt to amend the claims resulted in a second rejection upon the same grounds. A third attempt to amend resulted in rejection of the claims upon the grounds of indefiniteness. Finally, acting upon a suggestion of the patent examiner, the claims were rewritten so as to limit the claims to a sock having a garter band portion with loop stitches "at least twice" or "several times" the length of the loop stitches in the leg or foot portion and having elastic laid in the garter band portion.

As Floyd was finally granted, no single prior art patent discloses a sock having the exact combination disclosed in Floyd.

Other than patent references, no evidence of prior use or prior disclosures was made in the evidence with respect to this patent. Accordingly, the Floyd patent disclosed a sock that was novel and new. That it disclosed an article having usefulness is apparent.

However, the element of invention is not so apparent. In fact, it is clear unto the Court that the disclosure and teachings of the Floyd Patent would be obvious to a person having ordinary skill in the art of knitting socks as that art existed and was disclosed at the time the Floyd application was filed. The following chart includes the patents cited by the Patent Office during the prosecution of the Floyd Patent No. 2,466,885, and those cited by defendants' experts, Professor Shinn and Mr. Levin, for the purpose of attacking the validity of the '885 patent (each of that patent's claims):

FLOYD 2,466,885

| PATENTS CITED BY PATENT OFFICE | | PATENTS CITED BY MR. LEVIN | | PATENTS CITED BY PROF. SHINN | |
|---|---|---|---|---|---|
| NO. | NAME | NO. | NAME | NO. | NAME |

GROUP I

NO ELASTIC. BODY YARN LOOPS ELONGATED BY SINKERS.

| 241,392 | Great Britain | 241,392 | Great Britain | 241,392 | Gr. Britain |

GROUP II

FABRICS WITH ELASTIC YARN

| 2,052,875 | Gammons | | | | |
| 2,120,665 | Crimmins | | | | |
| 2,247,343 | Fregeolle | | | | |
| 2,315,119 | Green | | | | |
| 2,323,988 | Fregeolle | 2,323,988 | Fregeolle | 2,323,988 | Fregeolle |

GROUP I

| 412,324 | Ellis |
| 1,413,951 | Witherell |
| 2,376,050 | Green |

GROUP II

| 2,039,932 | Riggs | | |
| 2,306,246 | Davis | 2,306,246 | Davis |
| 2,230,402 | Getaz | | |

The patents listed above the line include those cited by the Patent Office and also cited by defendants' experts, and the patents listed below the line include patents relied upon by defendants but not cited by the Patent Office. The patents included within Group I each disclose knitting of body yarn loops of elongated length over the sinkers without any elastic yarn being inlaid in the fabric. Group II patents include fabric with elastic yarn laid in but without any stitch elongation or course yarn length ratio of 2 to 1 or greater.

As indicated in the Floyd patent, terry attachments for making the elongated stitch shown in the cuff of his sock were well known at the time. Terry attachments and drop stitch attachments for making elongated loops were available for the Scott and Williams circular knitting machine as early as 1925. The British patent 241,392 taught the knitting of a sock having a slack knitted fabric in the top and knit over the nibs of the sinker to form the larger loop. This was in 1925. Witherell 1,413,951 taught substantially the same, except the elongation of the loops was formed by use of two sinkers in a single slot, each having throats of different depths to allow the drawing of a longer length loop. The Davis Patent 2,306,246 and the Getaz Patent 2,230,402 teach the knitting in of elastic yarn in the makeup of a sock cuff. The Fregeolle Patents 2,247,343 and 2,323,988 clearly show a mock rib fabric with laid in rubber yarn having stitches in some wales larger than stitches in other wales. The Green Patent 2,315,119 shows a sock in which the cuff portion loops are larger than the foot portion loops and rubber yarn is laid in certain portions of the cuff and knit in other portions of the cuff. Thus, the prior art clearly discloses everything shown in the Floyd patent except the exact ratio of two to one or greater in the length of loops in the cuff as compared to the length of loops in the leg or foot portion of the sock. There is nothing inventive in going from an "elongated" loop in the cuff to a two to one or greater ratio. Going from a knitted loop having a ratio of 1.99 to a knitted loop having a ratio of two or more, even going from a ratio of 1.5 to a ratio of two or more, is such a minute change in the art as to appear obvious to one unskilled in the art, much less one skilled in the art. Such a minute change in the prior art is not "unobvious".

The defendants further insist that the Floyd patent is invalid for having injected new matter in making the third amendment to the application. It is the defendants' contention in this regard that the two to one or greater ratio disclosed in the claims as allowed (these claims having been filed in the third amendment) was not reflected in the original drawings and disclosures. However, in view of the above conclusions of the Court in regard to this patent, it will not be necessary to consider the defendants' contentions with respect to new matter.

(21) The next patent in order of filing is the Crawford Patent No. 2,420,771 (Crawford No. 1). The application for this patent was filed November 30, 1945. The patent was granted May 20, 1947. The basic disclosure involved was a machine and method for knitting a sock having a loose knit elastic fabric in the top or cuff portion, the purpose being to produce a more comfortable and less binding elastic top sock. More exactly, the basic disclosure involved was a machine and method for knitting socks having an integrally knitted elastic cuff and leg and foot portion, that is, having the entire sock automatically knit upon a single machine, with the foot and leg portion being made in a conventional manner, but with the cuff being knit over the nibs of all of the sinkers while laying in elastic, thereby producing a sock with greater stretchability in the cuff than would be the case with a sock having the elastic knit in the cuff or having loops in the cuff of substantially the same length as the loops in the leg and foot portion of the sock. For purposes of brevity only, this patent may be said to teach "over the nibs knitting" to form

a loose rubber top sock. The patent application filed by the Crawfords on November 30, 1945, contained seven claims. Original claims 1 and 2 disclosed an apparatus for knitting an elastic top stocking or fabric; claims 3 thru 5 and 7 disclose a method of making an elastic top stocking; and claim 6 describes the structure of an elastic top stocking. A preliminary amendment filed on May 8, 1945 (p. 23 of Exhibit 18) cancelled claim 6 as permitted by the Rules of Practice of the United States Patent Office. A second preliminary amendment was filed on July 16, 1946, (p. 25 of Exhibit 18) in which a further description was made to the specifications, a portion of which the examiner claimed recited new matter and cancellation was required. In the first official action the examiner cited twelve prior art patents. All claims were rejected on the basis of an indefinite or defective disclosure with claims 5 and 7 being rejected, also, on the cited prior art patents. Therefore, the application was amended by cancelling the originally submitted claims and substituting five additional claims which were ultimately allowed in substantially the form presented. Of the five claims which issued in the '771 patent, claims 1 and 2 describe an apparatus for knitting an elastic top stocking, and claims 3 thru 5 inclusive describe a method of knitting an elastic top stocking of circular knit construction.

It might be appropriate at this point to clear up one other matter before proceeding with a consideration of the validity of the '771 patent, that is, the contention made by the plaintiff at the trial of this case that only claim 5 of this patent requires that all body yarns be knit over all nibs, and that claims 1 thru 4 are broad enough to cover the knitting of the body yarns over some but less than all of the sinkers.

While claims 1 thru 4 as written, and without reference to the remainder of the patent, may be subject to such a broad construction, when read with reference to the specifications and the drawings, it is clear that a patent monopoly was granted and allowed only with regard to the knitting of all body yarns over all nibs of the sinkers. This construction of the patent is further borne out by the file wrapper history. For example, Column 1, Line 13 of the patent refers to the fact that "the entire body yarn loops will be formed on top of the nibs of the sinkers". Line 36 of Column 4 states that the sinker action will be such as to cause "all body yarns to be laid on top of the nibs of the sinkers". Figure 5 confirms this construction of the patent as do other references in the patent and as does the file wrapper history. As reflected in the file wrapper, after initial rejection of the claims by the patent examiner upon the ground that they involved "no patentably new method of knitting", the attorney for the applicant filed an amendment and rewrote the claims in the manner in which they were eventually approved. In requesting approval of the claims as thus rewritten, the applicant's attorney stated:

"It is therefore believed that the present claims in this application clearly point out a structure or method which is not shown in any of the references of record. It is also believed that the applicant has devised a structure and a method of knitting, namely, *the knitting of all of the body yarn loops on all of the nibs of the sinkers* and having an elastic strand held below the nibs of the sinkers to cause shedding of the loops and that this is a contribution to the art of knitting and that it has not been shown heretofore in the patents of record. It is therefore believed that the claims now in the application are clearly allowable." (Emphasis added.)

Returning now to the testimony upon the issue of validity of the '771 patent (*Crawford No. 1*), the following chart includes the patents cited by the Patent Office during the prosecution of the Crawford et al. Patent 2,420,771, and those cited by defendants' witnesses Shinn and Levin for the purpose of attacking the validity of the '771 patent:

## CRAWFORD ET AL 2,420,771

| PATENTS CITED BY PATENT OFFICE | | PATENTS CITED BY MR. LEVIN | | PATENTS CITED BY PROF. SHINN | |
|---|---|---|---|---|---|
| NO. | NAME | NO. | NAME | NO. | NAME |

### GROUP I

#### NO ELASTIC—BODY YARN LOOPS FORMED OVER HIGH PORTIONS OF SINKERS

| NO. | NAME | NO. | NAME | NO. | NAME |
|---|---|---|---|---|---|
| 24,618 | (France 530,015) | | | | |
| 241,392 | Great Britain | 241,392 | Great Britain | | |

### GROUP II

#### ELASTIC YARN WITH NORMAL STITCHES

| NO. | NAME | NO. | NAME | NO. | NAME |
|---|---|---|---|---|---|
| 2,117,208 | Page et al | 2,117,208 | Page et al | 2,117,208 | Page et al |
| 2,171,236 | Getaz | | | | |
| 2,174,439 | Dickens | | | 2,174,439 | Dickens |
| 2,199,302 | Coleman | | | | |
| 2,244,870 | Green et al | | | | |
| 2,247,343 | Fregeolle | | | | |
| 2,261,595 | St. Pierre | 2,261,595 | St. Pierre | 2,261,595 | St. Pierre |
| 2,310,070 | Fregeolle | | | 2,310,070 | Fregeolle |
| 2,315,119 | Green | 2,315,119 | Green | 2,315,119 | Green |
| 2,323,988 | Fregeolle | 2,323,988 | Fregeolle | | |

### GROUP I

| NO. | NAME | NO. | NAME |
|---|---|---|---|
| 218,460 | Shaw | | |
| 412,324 | Ellis | | |
| 1,831,129 | Minton | 1,831,129 | Minton |
| 2,376,050 | Green | | |

### GROUP IA

#### NO ELASTIC—SOME ELONGATION

| NO. | NAME |
|---|---|
| 1,152,850 | Scott |

### GROUP II

| NO. | NAME | NO. | NAME |
|---|---|---|---|
| 2,054,217 | Getaz | 2,054,217 | Getaz |
| 2,168,869 | Getaz | 2,168,869 | Getaz |
| 2,230,403 | Getaz | | |

———◆———

Group I contains patents which disclose body yarn loops formed over high portions of sinkers but which do not disclose elastic yarn laid in the fabric; the

Group IA patents illustrate some loop elongation without any inlaid rubber yarn; and the Group II patents show the knitting of normal length stitches with knitted or laid-in elastic yarn. The patents which appear above the horizontal line are those cited by the Patent Office and defendants' experts; those that appear below the horizontal line are those patents cited by defendants' experts only.

Defendants' experts have included in their citation of prior art a substantial number of patents cited by the examiner in the prosecution of the '771 patent. In addition, defendants' expert Levin sought to cite additional references which he contended were pertinent prior art references which had been overlooked by the examiner.

The Shaw Patent 218,460 of 1879 does not teach or suggest the use of any rubber yarn and provides for elongation of stitches by knitting over the high points of the web holders (sinkers). French patent 530,015 and British patent 241,-392, cited by the examiner, show knitting over the nib of 12 of the sinkers and also knitting over the elevated portion of a sinker. The British patent illustrates knitting over various levels of a sinker. Ellis patent 412,324 of 1899 includes a cam for raising the sinker-like elements to cause the yarn to knit over the element for longer loops but there is no showing of rubber yarn to shed elongated stitches, and Ellis requires the use of a weight to draw the fabric from the web elements.

Minton patent 1,831,129 is for the purpose of knitting over the nibs of the sinkers in the make-up only of selvage to form several convolutions of yarn on the tops of the sinkers to permit the needles to engage randomly one or more of the strands to form some non-ravel tuck stitches for an antiravel course without the use of a dial. There is no suggestion in Minton for the use of an elastic or rubber yarn.

Green patent 2,376,050 is illustrative of a knitted stocking having terry loops for a cushion sole. Figure 7 of Green illustrates the knitting of one body yarn over the nibs of the sinkers and another body yarn knit under the nibs of the sinkers. The elongated terry loops formed over the nibs of the sinkers are shed by the loops formed under the sinker nibs. Green does not even suggest the incorporation of a rubber yarn in conjunction with the terry loops which are freely extending from the knitted ground or base fabric. Defendants rely heavily upon the formation of terry fabric in support of invalidity despite testimony that unusable fabrics would be made when the ground fabric yarn was knit over the sinker nibs with the terry loop forming yarn.

The Getaz patents 2,054,217, 2,168,869 and 2,230,403 all refer to a method of knitting or a knitting machine in which elastic is interlaced in the fabric utilizing needle selection and applying rubber under tension to form normal length stitches. The cited Getaz patents make no reference to knitting over the nibs of any sinkers or to the formation of very long loops in the fabric while laying in rubber yarn to form a simulated rib.

Defendants' expert, Professor Shinn, included in his list of references several patents that were included by Levin but in addition included the basic Scott patent 1,152,850 which makes no reference to any loop formation or knitting over the nibs of sinkers for producing very long loops. No reference is made in Scott of the laying in of rubber yarn which was a development that occurred approximately twenty years after the Scott patent issued in 1915. The Page patent 2,117,208 was cited by the examiner and is a more recent Scott and Williams machine that included and updated all of the teachings in the basic Scott patent 1,152,850. The prior art patents cited by the defendants' witnesses and not included in the patent examiners prior art references appear to be cumulative to those cited by the examiner.

While prior art was shown to have existed for knitting over the nibs of some or all sinkers to produce an elongated stitch, no prior art taught the knitting of all body yarns over all nibs of the sinkers. While prior art was shown to

have existed for laying in of elastic, no prior art taught the laying in of elastic while knitting all body yarns over all of the sinkers.

It accordingly appears that no single prior art reference taught the machine and method claims set forth in the '771 patent (Crawford No. 1). Upon the basis of the construction hereinabove placed upon Claims 1 thru 4 by the Court, the subject matter of the patent was new or novel with respect to each of the five claims. It likewise had the utility required for patentability.

In denying invention the defendants relied heavily upon evidence relating to the knitting of sock sections by use of pile or terry loops. Circular knit socks having pile or terry loops were manufactured and sold in the late 1930's and early 1940's. In the knitting of a circular knit terry or cushion fabric, a first body yarn was placed over the body portion of a sinker while a second terry yarn was placed over the nib or top of that sinker. The body yarn, when knit, formed the ground or base fabric and the terry yarn formed a freely extending pile loop attached only to the ground or base fabric. The base or ground fabric body loops were interconnected with each other in a plain knit fabric, but the terry loops are independent and non-connected loops. Shedding of the terry loops was never a problem as the terry loops were not interconnected, or inter-looped with the plain knit fabric. The ground or base fabric made from the body yarn did not give problems in shedding as the throats of the sinkers shed the stitches from the needles in a conventional manner. The body yarn loops of normal length could be shed readily by the sinker advance causing the terry loops to be removed from over the sinker nibs. Elastic yarn was also used in conjunction with socks having a terry top garter band portion, however, the stitches in base fabric of the garter band portion were substantially the same length as the stitches in the other portions of the sock. The elastic yarn was merely laid in selected courses (every other or every fourth course) in the garter band portion.

It appears unto the Court that what Cecil and Herman Crawford actually did, other than possibly alter the position of the elastic yarn feed finger, was to alter the sinker action upon a conventional machine by altering the sinker ring cams so as to cause the sinkers to be inserted radially inward at the body yarn feed station, thereby causing the body yarn to be deposited and knit on top of all of the sinkers rather than upon the ledge of the sinkers as had been conventional. What they accomplished by making these rather simple mechanical changes, however, was a method of knitting which produced elongated loops that were shed by the pull of the elastic yarn, the elastic yarn performing the shedding operation normally performed by the throat of the sinkers. This method of knitting had not before been fully practiced nor disclosed. No one before appears to have conceived of the combination of knitting over all of the nibs of the sinkers while laying in elastic. No one before appears to have conceived of using the elastic, instead of the throats of the sinkers, to accomplish shedding. The Court is accordingly of the opinion that the defendants have failed to carry the burden of proof of showing that the subject matter of the '771 patent would have been obvious to one skilled in the art as of the time the patent was granted and that the presumption of validity would therefore prevail to sustain the validity of each of the claims in the said patent as those claims have been hereinabove construed.

(22) The next patent in order of filing was the Crawford Patent No. 2,473,677 (Crawford No. 2). Infringement of this patent was initially alleged by the plaintiff, but all claims of infringement were withdrawn before the trial. Nevertheless, by counterclaim the defendants seek to invalidate this patent.

The '677 patent is for "over the nib" knitting while laying in elastic yarn in selected wales to produce a pattern or

embossed effect as shown in Figure 15 of the '677 patent. There are only four claims in the '677 patent and each claim is for an apparatus in which the sinkers are advanced so that knitting all body yarns will occur over the nibs of all sinkers while stepping or patterning the elastic by a predetermined selection of needles. The '677 patent, as in the '771 patent, teaches knitting a very loose stitch fabric while laying an elastic strand in the courses of very loose stitches and specifies the length of the elongated stitches being from 30 per cent to 100 per cent longer than the regular loops or stitches. The pattern effect was accomplished by means of a pattern drum which selectively raised the needles to cause the elastic strand to be deposited in front of some needles and behind other needles in a predetermined pattern while placing all of the body yarns on top of all of the nibs of the sinkers. The following chart includes the patents cited by the Patent Office during the prosecution of the Crawford et al Patent No. 2,473,-677, and those cited by defendants' witnesses Shinn and Levin, for the purpose of attacking the validity of the '677 patent:

### CRAWFORD 2,473,677

| CITED BY PATENT OFFICE | | CITED BY MR. LEVIN | | CITED BY PROF. SHINN | |
|---|---|---|---|---|---|
| NO. | NAME | NO. | NAME | NO. | NAME |
| 1,309,124 | Fischer | HELD DOWN ROLL — NO ELASTIC | | | |

#### GROUP I

#### NO ELASTIC — BODY YARN LOOPS FORMED OVER HIGH PORTIONS OF SINKERS

| | |
|---|---|
| 2,255,693 | Jones |
| 24,618 | France (530,015) |
| 221,686 | Great Britain |

#### GROUP II

#### ELASTIC YARN WITH NORMAL STITCHES

| | |
|---|---|
| 2,244,870 | Green |
| 2,310,070 | Fregeolle |
| 2,323,988 | Fregeolle |
| 475,760 | Great Britain |

#### GROUP III

#### ELASTIC YARN WITH ELONGATED LOOPS

| | |
|---|---|
| 2,420,771 | Crawford |

#### GROUP II

| | |
|---|---|
| 2,054,217 | Getaz |
| 2,117,208 | Page |
| 2,168,869 | Getaz |
| 2,171,236 | Getaz |
| 2,306,246 | Davis |

The patents in Group I disclose the formation of body yarn loops over high portions of sinkers with no elastic yarn being laid in the fabric; the patents in

Group II illustrate the formation of normal length stitches with elastic yarn being laid in the fabric; and the patents in Group III show the formation of elongated loops with laid-in elastic yarn.

Patents listed above the horizontal line include those cited by the Patent Office against the '677 patent while in the Patent Office and also those patents cited by the defendants which were cited by the Patent Office. Those patents listed below the horizontal line are those cited by defendants which were not cited by the Patent Office.

All four of the claims in '677 (Crawford No. 2) are similar to the claims in '771 (Crawford No. 1) in the matter of knitting all body yarns over all sinker nibs. The use of a pattern drum or pattern control means was old in the knitting art at the time of the '677 patent application. While the four apparatus claims of the '677 patent (Crawford No. 2) produced a useful sock that was not anticipated by any single prior art reference, there is in the Court's opinion nothing unobvious in combining a known pattern control device with the knitting method taught in the prior '771 patent (Crawford No. 1). Anyone with ordinary skill within the art would readily recognize and quite simply accomplish the combination of these two known means to achieve the desired result.

(23) The fourth and final patent in order of filing was the Surratt Patent No. 2,716,876. The application for this patent was filed April 26, 1954, and the patent was granted on September 6, 1955. The purpose of the Surratt patent is the same as the purpose of the Crawford Patent No. 2,420,771 (Crawford No. 1), that is, to knit a loose top sock with elastic laid in rather than knit in. In fact, Mr. Surratt, a skilled knitting technician, testified at the trial that he observed a machine knitting over the nibs in accordance with the Crawford No. 1 patent in April 1952 and he thereupon set about to devise another means to accomplish the same result. Rather than lengthen the stitch in the cuff portion by knitting over the nibs, thereby accomplishing an increase in the draft between the needle and the knitting ledge as had been done by Crawford, Surratt conceived the idea of continuing to use the body portion of the sinker as the knitting ledge but increasing the draft between the sinker knitting ledge and the needles by further lowering the needles by inserting an auxiliary stitch cam, thereby drawing the needles lower than they would be drawn by the standard or existing stitch cam. By laying in elastic while using the auxiliary stitch cam to knit an elongated loop in the body yarns, Surratt succeeded in producing a sock having the same qualities as the sock produced under the Crawford No. 1 patent. Surratt further testified that his invention consisted only of the use of an auxiliary stitch cam on a conventional machine, while laying in elastic. However, he stated that after he had built his machine, he submitted it to the patent attorneys and left to them the definition of the claims.

As finally granted, the Surratt patent has 14 claims. The first three claims specify an auxiliary stitch cam on a circular knitting machine. These claims do not include an elastic yarn. Claims 4 and 5 specify both an auxiliary stitch cam and an elastic yarn feed mechanism. Claim 6 specifies an auxiliary stitch cam and means for tensioning the yarn, but no elastic feed is specified. Claims 7 and 8, in lieu of specifying the auxiliary stitch cam, specify a "means for lowering the needles to an abnormally low level" while laying in elastic. Claims 9 thru 14 are method claims which specify the knitting of a loose rubber top sock by lowering the needles to "a substantially lower level" than normal while laying in elastic and forming elongated loops. It will be noted that each of the claims except 1, 2, 3 and 5 include the laying in of elastic and 6 refers to placing tension upon the yarn. It is contended by the plaintiff that the elastic aids in shedding the elongated stitches rather than depending upon the throats of the sinkers to do so. For even though the knitting

is done on the body ledge of a sinker, if the sinkers were set to move inwardly a sufficient distance to shed the elongated stitches, they would then sever the yarn while knitting the shorter or normal stitches.

In attacking the validity of the Surratt patent, the defendants depend both upon prior use and prior patents in their attempt to establish prior art. The following chart includes patents cited by the Patent Office during the prosecution of the Surratt Patent No. 2,715,876, and those cited by defendants' experts for the purpose of attacking the validity of the '876 Surratt patent:

## SURRATT 2,716,876

| PATENTS CITED BY PATENT OFFICE | | PATENTS CITED BY MR. LEVIN | | PATENTS CITED BY PROF. SHINN | |
| --- | --- | --- | --- | --- | --- |
| NO. | NAME | NO. | NAME | NO. | NAME |
| **GROUP I** | | | | | |
| **NO ELASTIC — BODY YARN LOOPS FORMED OVER HIGH PORTIONS OF SINKERS** | | | | | |
| 2,276,705 | Smith | | | | |
| **GROUP IA** | | | | | |
| 1,152,650 | Scott (In. Spec) | 1,152,850 | Scott | 1,152,850 | Scott |
| 2,135,185 | Lawson | | | 2,135,185 | Lawson |
| **GROUP II** | | | | | |
| **ELASTIC YARN WITH NORMAL STITCHES** | | | | | |
| 2,315,119 | Green | | | | |
| **GROUP III** | | | | | |
| **ELASTIC YARN WITH ELONGATED LOOPS** | | | | | |
| 2,473,677 | Crawford | 2,473,677 | Crawford | 2,473,677 | Crawford |
| **GROUP IV** | | | | | |
| **NO ELASTIC — MOVABLE CAM** | | | | | |
| 2,421,816 | Thurston | | | | |
| **GROUP I** | | | | | |
| | | | | 1,831,129 | Minton |
| **GROUP IA** | | | | | |
| | | | | 1,189,220 | Scott |
| **GROUP II** | | | | | |
| | | 2,054,217 | Getaz | 2,054,217 | Getaz |
| | | 2,230,403 | Getaz | | |
| | | 2,168,869 | Getaz | 2,168,869 | Getaz |
| | | 2,306,246 | Davis | | |
| | | | | 2,230,402 | Getaz |
| | | 2,117,208 | Page | 2,117,208 | Page |
| | | 2,199,302 | Coleman | 2,199,302 | Coleman |
| | | 2,251,531 | Thurston | | |
| | | 2,039,932 | Riggs | | |
| | | | | 2,276,892 | St. Pierre |
| | | | | 2,310,070 | Fregeolle |

The basic Hemphill (Banner) circular knitting machine for automatically knitting a seamless stocking was patented on September 7, 1909, as Patent No. 933,443 by J. D. Hemphill. The Hemphill machine utilizes a cylinder rotatably mounted in a bed plate. Stitch-forming cams are mounted on a cam plate, and the cam plate is vertically movable within limits making it possible to adjust the size of the knitted stitch in a graduated or incremental form from one end of the stocking to another to compensate for the leg shape of a wearer. The basic Scott & Williams circular knitting machine for automatically knitting stockings is disclosed in U. S. Patent No. 1,152,850 issued to Robert W. Scott on September 7, 1915, and in U. S. Patent 1,189,220 issued June 27, 1916, to Robert W. Scott, and the latter patent which was a divisional application of the previously noted Scott patent teaches a stitch length mechanism. In the Scott patents, incremental stitch adjustment is provided by adjusting screws which raise and lower the needle cylinder which in turn raises or lowers the sinkers. The stitch-forming cams that engage the butts of the needles remain stationary and in spaced relation to the cylinder so that they might draw the needles downwardly during the loop-forming operation. In both the Scott & Williams and Hemphill circular knitting machines, one or more yarn feed fingers is employed to feed the main body yarn to the needles as the cylinder rotates so that the body yarn is fed to the hooks of the needles and loops are then formed in the knitting wave. Adjustments for incrementally changing the stitch length are incorporated in Banner (Hemphill) and Scott & Williams circular knitting machines. In Banner machines, the cam block is moved vertically to achieve the desired incremental change in stitch lengths. In Scott & Williams machines, the cylinder is raised incrementally to obtain a small stich adjustment. By lowering the cam block in Banner machines, the needles are lowered, while in Scott & Williams machines, the needles are lowered relative to the cylinder and sinkers when the cylinder and sinkers are raised to lengthen the stitch.

During the prosecution of the Surratt patent, the Patent Office cited, by way of prior art, both Thurston et al. 2,421,816 and Lawson et al. 2,135,185, both of which refer to Banner knitting machines having stitch forming cams that are mounted on a vertically displaceable cam plate or block which can be adjusted for incremental stitch length modifications. In Thurston et al., a rubber yarn is laid in the garter band portion; however, there is no reference made to elongated stitches in the cuff portion. Thurston et al. also shows a terry portion or cushion sole in the foot of the sock. Smith 2,276,705 cited by the examiner during the prosecution of the Surratt application discloses the knitting of pile fabric for hosiery and particularly describes a rocking or tiltable sinker, but no mention is made of abnormally elongated or very loose stitches in the garter band or cuff portion of a sock with laid-in rubber yarn to form a gently stretchable elastic top.

Significant in the prosecution of the '876 Surratt patent was the citation of the second Crawford et al. patent 2,473,-677 which discloses disposing all of the body yarns over the nibs of all the sinkers and elastic yarn laid in the throats of the sinkers. The examiner, during the prosecution of the Surratt patent application, was unable to find, in a circular knitting machine, an auxiliary stitch cam for drawing abnormally elongated loops as called for in claims 1 thru 3. In addition, the examiner was unable to find any disclosure showing a circular knitting machine for forming abnormally elongated loops over the body portions of the sinkers while laying in elastic yarn with the elastic yarn being used for shedding the abnormally elongated stitches. Defendants, however, have found two pertinent references, these being French Patent 850,510 which shows an auxiliary stitch cam L in Figures 7 thru 9, inclusive, and the Sheppherd Patent 2,200,209 which discloses a movable stitch cam 360. Upon this showing the plaintiff

disclaimed claims 1 thru 3 in the course of the trial. Plaintiff, by disclaiming claims 1 thru 3, has admitted that such claims are invalid.

Defendants' experts have relied upon 22 patents in addition to the patents cited by the Patent Office Examiner in an attempt to invalidate the Surratt patent claims. Getaz 2,054,217, Getaz 2,230,403, Getaz 2,168,869 and Davis 2,306,246 all refer to the make-up or selvage edge and laying in of rubber yarn under high tension to form a plain knit mock-rib fabric. Page 2,117,208 discloses a rib-knit fabric, and according to Professor Shinn, this is an entirely different fabric from a plain-knit fabric. There is no suggestion in Page for abnormal stitch elongation as contrasted with normal length stitches. Coleman 2,199,302 illustrates the knitting or laying in of elastic yarn in selected wales, but there is no indication or teaching in Coleman of knitting all body yarns over the body portions of the sinkers to produce abnormally elongated loops in one portion of the sock. Thurston 2,251,531 relates to a full fashioned sock having a plain knit rubber top that is separately knit on a circular knitting machine and then attached to the full fashioned knit blank. In Riggs 2,039,932, a rib knit fabric is disclosed with longer loops for a garter top with rubber yarn laid in, but Riggs involves a hand transfer of the rib top to a plain knit machine and is a step backward in the art from the Getaz and Davis patents. Riggs does suggest that the rib top be made on a larger diameter cylinder in order to achieve the increased stretchability, and reference is made in that patent to a loose course of stitches for the hand transfer operation. The Crawford '771 patent does not contemplate knitting over the body portions of the sinkers to anticipate Surratt as all body yarns are placed over the nibs of some or all of the sinkers but does teach the use of elastic to shed or assist in shedding elongated loops that cannot be shed by the throats of the sinkers. The Floyd patent makes no reference to knitting elongated stitches by depositing all body yarns over the body portions of the sinkers. Minton 1,831,129 discloses knitting over the nibs of sinkers to form a make-up without rubber yarn.

Professor Shinn relied upon the basic Scott patent No. 1,187,220 to illustrate that stitch elongation was attainable by raising and lowering the cylinder. He also relied upon St. Pierre 2,276,892 and Fregeolle 2,310,070. Fregeolle shows the placement of elastic yarn over the nibs of selected sinkers to increase the elastic yarn length and obviate the high tension found objectionable in elastic top socks. St. Pierre discloses a method of incorporating an elastic yarn into a knitted fabric to eliminate high tension.

In addition to prior patents, the defendants relied upon evidence of prior use to attack the validity of the Surratt patent. The witness Coile testified that he had manufactured and sold auxiliary stitch cams prior to the date of the Surratt application. The witness Goley Marlette, who is head of the Research & Development Department of a large hosiery manufacturer, testified that his company purchased an attachment from Coile's company, Keller Machine Works of Athens, Georgia, in February of 1954, which attachment was delivered on or before April 16, 1954. The attachment included an auxiliary stitch cam to be mounted on a circular knitting machine for drawing elongated loops while laying in rubber yarn in the cuff portion of a loose rubber top sock. Catalogs and drawings predating the Surratt application were introduced by the witness showing various attachments and cams for regulating the stitch length on a circular knitting machine.

With respect to the auxiliary stitch cam testified to by Coile and Marlette, an issue is raised by the plaintiff both that such disclosure was after the conception by Surratt of his invention and that in any event Claims 7 thru 14 cover not just the auxiliary stitch cam but any method of drawing abnormally long stitches while lowering the needles "substantially lower" than normal and while laying in elastic. Apart from the testi-

mony of the witnesses Coile and Marlette, it may well be that the Surratt disclosures are new and novel. No single prior art patent appears to read exactly upon Claims 4 thru 14 in Surratt. Surratt also obviously meets the utility requirement for patentability. But even apart from the Coile and Marlette testimony, it appears unto the Court that all claims of the patent are invalid for lack of invention. The state of the art, as disclosed by the patents granted prior to the Surratt conception, disclosed everything that Surratt did. The use of auxiliary cams, duck cams, and stitch cams to alter the length of stitches in different portions of the sock was known, as was the raising of the needle cylinder and the lowering of the cam block to accomplish the same result. The laying in of elastic was known. The use of elastic to accomplish or assist in shedding loops was known. When the testimony of Coile and Marlette as to prior use is considered, as the Court believes it should be, there was no inventive or unobvious combination accomplished by Surratt. Rather, what he discloses in his patent is that which would be obvious to one skilled in the art as that art was known at the time of Surratt's application for his patent. The difference between that which was claimed by Surratt and the pertinent prior art would have been obvious to a person reasonably skilled in that art.

### Infringement

(24) Although infringement of all four patents by one or more of the defendants was originally alleged by the plaintiff, prior to the trial of the case the plaintiff had withdrawn any allegation of infringement of the Crawford Patent No. 2,473,677 (Crawford No. 2). During the course of the trial the plaintiff conceded that no evidence existed of infringement of the Floyd Patent No. 2,466,885. In view of the findings of the Court with respect to the non-validity of the Surratt Patent No. 2,716,876, the only remaining issues with respect to infringement are the plaintiff's contentions with respect to the infringement of one or more claims of the Crawford Patent No. 2,420,771 (Crawford No. 1) by the defendants Crescent Hosiery Mills, Allied Hosiery Mills (McConkey) and Engleknit Hosiery Mills (East) and that the defendants, Niota Textile Mills, Tennessee Hosiery Mills and William P. Chesnutt, were guilty of contributory infringement of the said patent.

The evidence with respect to Crescent reflects that Crescent continued to knit over the nibs of all sinkers for a period of eight days after Crawford sent its notice of cancellation of the license agreement. Crescent then shut down its plant and altered the machines so as not to knit over the nibs of all sinkers. Thereafter, no machines of Crescent were operated so as to knit over the nibs of all sinkers as taught in each of the five claims of the Crawford No. 1 patent, as those claims have hereinabove been construed by the Court.

With respect to D. C. McConkey, trading as Allied Hosiery Mills, the evidence is rather indefinite as to how long he may have continued knitting over the nibs of all sinkers after the notice of cancellation of the licenses by Morpul. Apparently sometime in December of 1961 he converted some of his machines so as to knit over three sinker nibs and under one sinker nib. Again, the record is not clear, but apparently sometime during the early part of 1962 he converted the balance of his machines so as to knit over three sinker nibs and under one sinker nib rather than knitting over all nibs of the sinkers as he had formerly done.

As to the charge of infringement by R. B. East, trading as Engleknit Hosiery Mills, the evidence reflects that he promptly changed all of his machines so as to knit under the nibs of the sinkers rather than over the nibs of the sinkers after receiving the notice of cancellation by Morpul of his licenses. After the notice of cancellation, he continued knitting over the nibs only long enough to even up the dozens of certain sizes of socks.

With respect to the charge of contributory infringement of the '771 patent (Crawford No. 1) by the defendants, William P. Chesnutt, Niota Textile Mills Company and Tennessee Hosiery Mills Company, Inc., following the cancellation by Morpul of the licenses, the Court is of the opinion that there is no evidence of such contributory infringement.

## CONCLUSIONS OF LAW

(1) The plaintiff, Morpul, Inc., is the owner of the entire right, title and interest in and to United States Patent Nos. 2,420,771 (Crawford No. 1); 2,466,885 (Floyd); 2,473,677 (Crawford No. 2); and 2,716,876 (Surratt), and is entitled to institute actions for patent infringement under each of the said patents.

(2) These actions arise under the patent laws of the United States. This Court has jurisdiction of the parties and of the subject matter of this litigation. The original complaint alleged a cause of action for patent infringement. This Court is expressly granted jurisdiction of an action for patent infringement. (28 U.S.C. § 1338 and 35 U.S.C. §§ 271, 283 and 284). The defendants denied jurisdiction, contending that each defendant, other than Chesnutt, was licensed to infringe the subject patents at the time the suit was instituted, and that Chesnutt, being charged as a contributory infringer, could not be held to have contributorily infringed in the absence of a primary infringer. In further support of their denial of jurisdiction, the defendants contend that the attempted cancellation by the plaintiff of their licenses was ineffective to accomplish that result, both because the plaintiff had no legal right to cancel and because the patent infringement suit was instituted before the notice of infringement was received by the defendants.

▮ The allegation of infringement in the complaint is sufficient to give this Court jurisdiction. The fact of non-infringement does not operate to deprive the Court of jurisdiction. Otherwise, a finding of non-infringement would operate to deprive a federal court of jurisdiction and no adjudication of non-infringement could ever enter in a patent suit instituted in a federal court. The plaintiff must of course set up some right, title or interest under the patent laws which it contends were violated by the defendant. Starin v. City of New York, 115 U.S. 248, 6 S.Ct. 28, 29 L.Ed. 388. But when one is sued as an infringer, jurisdiction cannot be ousted by any answer the defendant may interpose. Globe Steel Abrasive Co. v. National Metal Abrasive Co. (C.C.A.6, 1939), 101 F.2d 489. The federal courts have jurisdiction of a suit for infringement of a patent notwithstanding that a license is set up in defense, so that the question of its existence is involved and must be tried in trying the question of infringement. Hammacher v. Wilson (C.C. 1886), 26 F. 239, appeal dismissed 145 U.S. 662, 12 S.Ct. 991, 36 L.Ed. 853; Smith v. Standard Laundry Machine Co. (C.C.N.Y., 1882), 19 F. 825. See also Everett v. Haulenbeek (C.C.N.Y., 1895), 68 F. 911.

(3) The defendants' contention that they were licensees at the time of the institution of this suit would accordingly not raise a jurisdictional issue, but would rather raise an issue of fact and law with respect to infringement or non-infringement, the same as the defendants' further contentions with respect to non-validity and non-infringement. However, since the contentions with respect to their being licensees and with respect to non-cancellation of their licenses prior to the plaintiff's institution of this suit were asserted in connection with their jurisdictional contentions, it would be in order to dispose of these issues at this time and prior to taking up a statement of the conclusions of law upon the issues of patent validity and other issues of non-infringement presented in the case.

▮ This Court is of the opinion that a valid cancellation of the license agreement between the plaintiff and the defendants was made prior to the institution of these lawsuits. The action taken

upon behalf of each defendant by their legal counsel in advising the plaintiff by a letter dated October 25, 1961, that the defendants no longer considered themselves obligated under their license agreements to pay the plaintiff royalty upon anything other than the use of the trademark "Morpul" would amount to an anticipatory breach of the license agreement by the defendants and would justify termination of the license agreement by the plaintiff. 17 Am.Jur.2d, "Contracts", Sec. 448, 449.

■ Under the express terms of the license agreement, cancellation could be effected by the plaintiff by "mailing a written notice to licensee". Where the parties to a contract, by express provision, provide for cancellation by mailing the notice of cancellation, cancellation is effective as of the date of mailing, and the actual receipt of the notice is not a condition precedent to cancellation. Dent v. Monarch Life Insurance Co., 231 Mo. App. 283, 98 S.W.2d 123; Wolonter v. United States Casualty Co., 126 Va. 156, 101 S.E. 58. See also annotation: 64 A.L.R.2d 995.

■ (4) The three distinct tests for patentability, as set forth in Sections 101, 102 and 103 of Title 35 U.S.C. may be cryptically summarized as novelty, utility and invention. Although compliance with each of these statutory requirements for patentability ultimately presents a question of law [Monroe Auto Equipment Co. v. Heckethorn Manufacturing & Supply Co. (C.C.A.6, 1964), 332 F.2d 406], in making each evaluation of patent validity the Court must make the following factual inquiries:

1. Initially, inquiry must be made into the *novelty* of the claimed subject matter of the patent to satisfy but one of the conditions of patentability as expressly defined in 35 U.S.C. Sections 101 and 102. If novelty is absent, no further inquiry need be made as patentability is defeated.

2. The claimed subject matter must also satisfy the condition of usefulness or utility for patentability as expressly

defined in 35 U.S.C. Sections 101 and 102. The "new and useful" tests were not altered by the 1952 Patent Act. If utility or usefulness is absent, no further inquiry need be made as patentability is defeated.

3. Only after the first two statutory conditions of novelty and utility have been satisfied will it be necessary to examine whether the third condition is satisfied. The 1952 Patent Act incorporates, as a further condition of patentability, the doctrine outlined in Hotchkiss v. Greenwood, 11 How. 248, 13 L.Ed. 683 (1850) in which case it was held that to constitute patentable invention the improvement made would be of that caliber which was greater than that which would be obvious to a skilled mechanic acquainted with the art to which the invention or improvement was addressed. The statutory requirement of non-obviousness as set forth in 35 U.S.C Section 103 requires inquiry be made into:

(a) the level of ordinary skill of the artisan in the pertinent art or technology must be established to evaluate whether the claimed subject matter is obvious or unobvious *at the time the invention was made* (Pertinent art, as hereinabove referred to, is that art to which one can reasonably be expected to look for a solution to the problem which the patented device attempts to solve);

(b) the scope and content of the prior art must be investigated; and

(c) the differences and similarities must be evaluated between the prior art and the claimed subject matter at issue.

The statutory requirements of Section 103 as summarized in paragraph (3) (a) (b) and (c) above were succinctly summarized by the Supreme Court in the recent case of Graham v. John Deere Co., (1966) 383 U.S. 1, at p. 17, 86 S.Ct. 684, at p. 693, 15 L.Ed.2d 545 in the following terms:

"Under § 103, the scope and content of the prior art are to be determined;

differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved."

■ (5) Applying the foregoing tests to the patentability unto the Floyd Patent No. 2,466,885, the Court is of the opinion that the patent is invalid as to each of the two claims thereof. While novelty and utility were present, the disclosures made with respect to each claim in the patent would have been obvious to a person having ordinary skill in the knitting of socks as that art existed and was disclosed at the time the Floyd patent application was filed.

■ (6) The Crawford Patent No. 2,420,771 (Crawford No. 1) is good and valid in law as to each of the claims 1 thru 5, in that the disclosures and claims therein made are novel and useful and were non-obvious to persons having ordinary skill in the art at the time the application for the patent was filed. It should be noted, however, that this conclusion of validity is predicated upon the further finding of the Court that claims 1 thru 4, when read with reference to the specifications and drawings, must be construed as teaching the knitting of all body yarns over all nibs of the sinkers. That the claims must be construed not on their literal reading, but rather in light of the specifications, drawings and file wrapper history, is borne out by the language of the Supreme Court in the recent case of United States v. Adams, 383 U.S. 39, at p. 48, 86 S.Ct. 708, at p. 713, 15 L.Ed.2d 572 (1965), wherein the Court stated:

"While the claims of a patent limit the invention, and specifications cannot be utilized to expand the patent monopoly, * * * it is fundamental that claims are to be construed in the light of the specifications and both are to be read with a view to ascertaining the invention * * *"

Likewise, in the case of Graham v. John Deere Co., 383 U.S. 1, at p. 33, 86 S.Ct. 684 at p. 702, 15 L.Ed.2d 545 (1965), the Court stated:

"It is, of course, well settled that an invention is construed not only in the light of the claims, but also with reference to the file wrapper or prosecution history in the Patent Office. * * * Claims as allowed must be read and interpreted with reference to rejected ones and to the state of the prior art; and claims that have been narrowed in order to obtain the issuance of a patent by distinguishing the prior art cannot be sustained to cover that which was previously by limitation eliminated from the patent."

■ (7) The Crawford Patent No. 2,473,677 (Crawford No. 2) is invalid as to each of the four claims thereof in that, while novelty and utility were shown to exist, there was nothing disclosed in the patent that would be unobvious to one having ordinary skill in the knitting art.

■ (8) The Surratt Patent No. 2,-716,876, is invalid as to each of the 14 claims thereof. Claims 1, 2 and 3 were conceded to be invalid and were disclaimed by the plaintiff during the course of the trial. The remaining claims were invalid over pertinent prior art for lack of invention. The matters claimed in each of the claims 4 thru 14 would have been obvious at the time of the patent application to one having ordinary skill in the knitting art.

■ (9) Following cancellation of the license agreement upon November 8, 1961, claims 1 thru 5 of Crawford Patent No. 2,420,771 (Crawford No. 1) were infringed by the defendant Crescent Hosiery Mills for a period of eight days. There was no showing of any further infringement upon the part of the said defendant. With respect to the infringement that did occur upon the part of this defendant, the Court is of the opinion that such infringement was so minimal as to warrant the application of the de minimis rule and dismiss any claim for infringement against the said defendant. No subsequent infringement having appeared and the '771 patent having expired in accordance with its terms prior

to the date of the trial, no injunctive relief would be in order.

 (10) Following cancellation of the license agreement upon November 8, 1961, claims 1 thru 5 of the Crawford Patent No. 2,420,771 (Crawford No. 1) were infringed by the defendant R. B. East, trading as Engleknit Hosiery Mills, but only to the extent of knitting sufficient socks to even up the dozens of certain sizes of socks. In view of the minimal nature of such infringement, the Court is of the opinion that the de minimis rule should likewise apply to the claim of infringement against the said defendant. No injunctive relief will be in order, the patent having expired.

(11) Following cancellation of the license upon November 8, 1961, Claims 1 thru 5 of the Crawford Patent No. 2,420,-771 (Crawford No. 1) were infringed by the defendant, D. C. McConkey, trading as Allied Hosiery Mills. The extent of such infringement was indefinite under the proof and further proof will be required both to determine the extent of the infringement and the amount of any damage due unto the plaintiff as a result thereof. No injunctive relief, however, would be in order, the patent having expired.

(12) No infringement having appeared upon the part of the defendants, Tennessee Hosiery Mills Company, Inc., Niota Textile Mills Company and William P. Chesnutt, the plaintiff's original action for infringement against the said defendants will be dismissed.

(13) It will be necessary to set these cases for a further hearing with respect to the following matters:

(a) The extent of infringement of the Crawford et al. Patent No. 2,420,771 by the defendant, D. C. McConkey, trading as Allied Hosiery Mills, and the amount of damage due the plaintiff by reason of such infringement.

(b) The defendants' counterclaim for damage for alleged violation of the antitrust laws by the plaintiff.

(c) The plaintiff's claim for patent royalties alleged to be due from the defendants, Tennessee Hosiery Mills Company, Inc., and Niota Textile Mills Company, which claim is set forth in the amendment to the plaintiff's original complaint.

(14) The entry of an order upon these findings of fact and conclusions of law will await a further hearing upon the matters hereinabove set forth unless the parties shall make other disposition of such matters prior to the hearing. All matters not herein decided will be set for trial to commence upon Monday, May 15, 1967. A pretrial of all such matters will be set for February 18, 1967, at 10:00 A.M.