**WITCO CHEMICAL CORPORATION, Plaintiff,**

v.

**The DOW CHEMICAL COMPANY, Defendant.**

**Civ. A. No. 84–514–JLL.**

United States District Court, D. Delaware.

Nov. 19, 1985.

Edmund N. Carpenter II, Robert H. Richards III and Robert W. Whetzel of Richards, Layton & Finger, Wilmington, Del. (Harold Haidt, G.T. Delahunty and C.G. Mueller of Brooks Haidt Haffner & Delahunty, and Alan M. Abrams and Morton Friedman, New York City, of counsel), for plaintiff.

Douglas E. Whitney and Mary B. Graham of Morris, Nichols, Arsht & Tunnell, Wilmington, Del. (Bernd W. Sandt and Michael S. Jenkins, Midland, Mich., of counsel), for defendant.

## OPINION

LATCHUM, Senior District Judge.

■ Witco Chemical Corporation ("Witco"), a Delaware corporation, brought this

action for patent infringement,[1] and unfair competition,[2] against the Dow Chemical Company ("Dow"), also a Delaware corporation. Witco's predecessor corporation, Isocyanate Products, Inc. ("IPI"), had entered into a License Agreement ("Agreement") with Dow, dated June 1, 1967, under which Dow was licensed for certain hoped-for patent rights involving use of polyether polyols which were at the time the subject of IPI's pending patent applications. The dispute which led to this litigation began when Witco gave Dow notice on September 17, 1979, that it was terminating the Agreement pursuant to its provisions. Dow responded that no such termination had occurred and, after Witco continued to claim that the Agreement was terminated, Dow filed a notice of intention to proceed in the Chancery Court of Delaware to resolve this issue. Dow later filed a Chancery suit. Witco then filed the present action in this Court. After a conference with counsel for the parties, Dow agreed to dismiss its Chancery action and proceed in federal court on the issue of whether Witco had terminated the Agreement.[3]

On April 8, 1985, Dow moved for summary judgment in this Court (Docket Item ["D.I."] 18) on the ground that no termination of the Agreement had occurred. After considering the parties' submissions on this motion and oral argument, this Court has determined that the Agreement is still in full force and effect and will therefore grant defendant's motion for summary judgment.

BACKGROUND

The interpretation of contract provisions is crucial to the resolution of the issues raised by Dow's summary judgment motion. Therefore, primary attention will be devoted to a description of the Agreement between Dow and Witco and the correspondence between the parties, applying the facts that are undisputed to the provisions of the Agreement. Since this case at its present juncture does not directly involve patent infringement, the technology of polyurethane foam need be only briefly described.

Kenneth P. Satterly, an owner/employee of IPI, Witco's predecessor, invented a rigid, insulating polyurethane foam at reduced cost. The foam is prepared by reacting an arylene polyisocyanate and a polyether polyol, an additional product of an alkylene oxide having three or more carbon atoms, and a polyol having at least four hydroxy groups and a chlorofluoro alkane as the essential blowing agent. (D.I. 39, ¶ 4.) Satterly's polyurethane foam gains its excellent thermal insulation from the fluorocarbon blowing agent which is retained within the closed cells of the foam. Satterly's insulation is nearly twice as efficient as the next best kind of commercial insulation and is recognized as the most cost effective insulation available commercially. (*Id.* at

---

1. Jurisdiction arises under 28 U.S.C. § 1338(a) and venue is based on 28 U.S.C. §§ 1392(a), 1400(b). Dow, the defendant, resides in the District of Delaware.

   Dow objects to this Court's lack of subject matter jurisdiction to decide the claim of patent infringement because Dow is licensed under the patents and thus immune from suit. (D.I. 34 at 19.) This latter claim has not been dismissed but reserved for judgment, should the Court decide against Dow on the issue of termination. Allegations of infringement are sufficient to give this Court jurisdiction. "The federal courts have jurisdiction of a suit for infringement of a patent notwithstanding that a license is set up in defense, so that the question of its existence is involved and must be tried in trying the question of infringement." *Morpul, Inc. v. Crescent Hosiery Mills Co.,* 265 F.Supp. 279, 303 (E.D. Tenn.1967).

2. Jurisdiction on this claim is based on 35 U.S.C. § 1338(b) and venue is based on 28 U.S.C. §§ 1391(c), 1400(b).

3. It should be noted at the outset that neither party contends nor argues in this case that the Agreement is unenforceable. Witco does refer in its brief (D.I. 17 at 7) and an affidavit (D.I. 39, ¶¶ 31–32) to the case of *Witco Chemical Corp. v. Peachtree Doors, Inc.* and *Mobay Chemical Corp.,* No. C81–1648A, slip op. (N.D.Ga. Dec. 4, 1984), where that Court held the Mobay-Witco license agreement to be a mere "agreement to agree" because the royalty rate was stated as not more than a specific rate. The same language appears in the Dow-Witco Agreement. However, since the unenforceability of the present Agreement has not been questioned in this case, the Court will not address that issue.

¶ 5.) The patent, No. 3,846,347 ('347 patent), was issued on this invention only on November 5, 1974. (*Id.* at ¶ 6.)

At the time that the Agreement was entered into with Dow, Witco's predecessor, IPI, a relatively small company, was being sued for patent infringement. This suit imposed significant burdens on IPI's finances. (D.I. 39, ¶ 7.) In order to finance its defense to this suit, IPI entered into separate license agreements with E.I. duPont de Nemours & Company, Mobay Chemical Corporation, Atlas Chemical Company, and Dow, four major suppliers to the polyurethane foam industry. (*Id.* at ¶ 8.) Under Witco's License Agreement with Dow, the need to report royalty payments on the use of polyols did not arise until a patent was actually issued. (*Id.* at ¶ 14.) On February 3, 1981, Witco was issued another patent, No. 4,248,975 ('975 patent), which covers rigid shrink stable thermal insulating polyurethane foams in language different from that of the '347 patent. (*Id.* at ¶ 28.) [4]

The genesis of this controversy occurred in 1967, when IPI entered into the Agreement with Dow, granting Dow a non-exclusive license to the rights of patents which had yet to be issued. (D.I. 1, ¶ 4.) The Agreement remains unchanged to the present, except for an amendment to the reporting terms by way of a letter agreement. [5]

The terms of the Agreement, as they pertain to the issues in this case, are as follows. The Agreement states Dow's desire for a license under the two patents with a right to sublicense this license to its subsidiaries. (D.I. 34A at A–1.) In Section 2(a), Dow and its subsidiaries have the right to grant immunity from suit to customers for infringement of the patent rights with respect to polyol sold by each of them. (*Id.* at A–2.) Pursuant to Section 3(a), Dow paid IPI $25,000 in part payment for the license and rights. Dow and IPI agreed that the "amount of polyol used or sold for use by Dow under Patent Rights is a convenient and adequate measure of royalties hereunder." (*Id.*, Section 3(b).) Dow further agreed to pay running royalties to IPI "at the rate of no more than one-quarter cent ($0.0025) per pound of polyols used or sold for use" under the rights applicable only after Dow and its sublicensed subsidiaries used or sold for use forty million pounds of polyols. (*Id.*) Section 4, whose language is central to this case, reads in full:

4. DOW AND SUBLICENSED Subsidiaries shall keep records in sufficient detail to permit an accurate determination of royalties which accrue under this agreement and DOW shall report to IPI in writing within sixty (60) days after the end of each calendar half-year during the life of this agreement the number of pounds of polyols which DOW and said Subsidiaries used or sold for use under Patent Rights during said half-year and accompany the report with a payment of any accrued royalties thereon. If DOW and said Subsidiaries during said half-year have not used any polyols under Patent Rights nor sold any for such use the report shall so state. DOW agrees that its pertinent records may be examined at IPI's request during regular business hours by a certified public accountant, reasonably acceptable to DOW, for the purpose of determining royalties accrued hereunder, and such accountant shall report to IPI the amount of accrued royalties only.

(D.I. 34A at A–3.)

Section 7(a), the termination provision, also merits quotation in full:

7(a). This agreement and license unless earlier terminated as hereinafter provided shall terminate upon the expiration of the last to expire of patents included in Patent Rights.

---

4. Witco contends that both the '347 and '975 patents would have been patent rights licensed to Dow under the Agreement. (D.I. 39, ¶ 28.)

5. Dow and Witco agreed on July 21, 1976, to modify a provision which required biannual reporting to require annual reporting instead until Dow commenced operations under the patents. (D.I. 34A at A–28.)

(b). DOW may terminate this agreement and license at any time by giving IPI sixty (60) days written notice thereof. (c). IPI may terminate this agreement and license upon sixty (60) days notice in writing to DOW in the event that DOW shall fail to make a payment of royalties, or render any report or keep accurate records or permit examination thereof as required herein; provided, however, that if any such failure is remedied within such sixty (60) day period the agreement and license shall not then be terminated. (d). Termination of this agreement and license, in whole or in part, shall not relieve DOW of its obligation to make payment or royalties that have accrued hereunder prior to the effective date of such termination or to render any report or to permit examination of records with respect thereto.

(D.I. 34A at A–4–5.)

At the time IPI entered into this Agreement with Dow, there was very little demand for rigid polyurethane foam and, thus, for the polyol used to make the foam. Only much later did a significant market develop, with a corresponding increase in value of the right to the license.

Dow's reporting under this Agreement can be traced clearly from the correspondence between the two parties. In arguing that it properly terminated the Agreement, Witco disputes that Dow complied with the Agreement's provisions on reporting or at the very least, that such compliance raises factual issues. On its motion for summary judgment, Dow in turn attempts to rebut Witco's allegations with evidence from the correspondence, including explanatory letters as well as reports.

Dow claims to have filed all reports of its activities as required under the provisions of the Agreement. Dow began reporting under the Agreement on November 3, 1975, when it stated that there had been no activity for the period January 1, 1975 to June 30, 1975. (D.I. 34A at A–24.) On May 19, 1976, Dow reported no activity for the period January 1, 1976 to December 31, 1976.[6] Subsequently, Dow duly reported no activity on February 28, 1977 for all of 1976 (*id.* at A–29) and on February 15, 1978 for all of 1977. (*Id.* at A–30.) Dow's first report of activity was on March 27, 1979, when it reported activity for the second half of 1978. (*Id.* at A–31.)[7]

By a letter of notice dated September 17, 1979, Witco stated that it was terminating the Agreement pursuant to Section 7(c).[8] In this letter, Witco claimed that Dow was required to keep records "which permit an

---

**6.** The parties agreed to an amendment of the Agreement on July 21, 1976, under which Dow would be permitted to report on an annual basis until activity began under the terms of the Agreement. (D.I. 34A at A–28.) Although Dow filed this annual report before this amendment was formalized on July 21, 1976, Dow in any event had already reported no activity to date on May 12, 1976. (*Id.* at A–25.)

**7.** Witco alleges that Dow breached the Agreement because it never made a report for the first half calendar year of 1978. (D.I. 38 at 11.) Witco apparently ignores the amendment to the Agreement, which permitted reporting on an annual basis until production of prepolymers began. Witco also complains about the absence of a report for the second half of 1974, when a report would first be required because of the issuance of the '347 patent on November 5, 1974. Significantly, Witco only raises these points in the context of litigation; they could not have ripened into breaches unless Witco had followed the provisions of the Agreement in giving notice to Dow of its deficiencies.

**8.** Dow, in its briefs and particularly at oral argument, focuses the issue of termination on the notice of September 17, 1979. Witco purported to effect termination over sixty days later, on November 28. (D.I. 34A at A–35.) The relevant portions of this notice, which states the alleged deficiencies, read as follows:

> In accordance with Paragraph 4 of the aforesaid license agreement, you are required to keep records which permit an accurate determination of the royalties due and to make periodic reports each calendar half-year during the life of the agreement. We have not received any such royalty reports. Accordingly, you are in default of said license agreement, and we are compelled pursuant to the provisions of Paragraph 7(c) of said license agreement to terminate said agreement as of sixty days from your receipt of this letter.

(*Id.* at A–32.)

accurate determination of the royalties due and to make periodic reports each calendar half-year during the life of the Agreement." (D.I. 34A at A–32.) Witco stated that since it had not received *any* royalty reports, Dow was in default of the Agreement. Witco did state, however, that there would be no termination if the fault was remedied within the sixty day period stipulated in the Agreement. Dow replied to Witco on September 25, 1979. In that reply, Dow stated that it had indeed sent royalty reports to Witco covering 1976 and 1977, reporting no activity under the Agreement, and the report on March 27, 1979, concerning the initial sale of polyols for the second half of 1978. (*Id.* at A–33.) Dow also sent a report to Witco on October 12, 1979, reporting activity for the first half of 1979. (*Id.* at A–34.)

Witco sent its next letter to Dow on November 28, 1979 which made two major complaints, *different* from those in its September 17 letter of notice, concerning the accuracy of the records used by Dow under the reporting provisions of the Agreement. First, Witco stated that Dow must report under the Agreement not only the number of pounds of polyols which Dow and its subsidiaries *sold* but also "the number of pounds of such polyols used by Dow and its subsidiaries." (D.I. 34A at A–35.) Witco contends that none of Dow's royalty reports had given the figures for the polyols *used*, and thus purported to terminate the Agreement pursuant to Section 7(c).[9] Second, Witco was concerned about the allegedly low level of sales of polyols reported by Dow. Witco questioned the type and kind of records which Dow kept and requested a "full explanation" of the records maintained and how Dow determined the quantity of polyols subject to the royalty reporting requirement. (*Id.*) On December 12, 1979, Dow responded to the November 28 letter of Witco. Dow stated that it had reported all the polyols used and sold by Dow and its subsidiaries in the production of prepolymer of the type covered by

Witco's patents. Dow also explained the records it used in preparing royalty reports, although by the terms of the Agreement it was not required to do so. The records showed only the quantity of the prepolymer which Dow and its subsidiaries *sell.* Neither Dow nor its subsidiaries *used* any of the prepolymer. Dow obtained the amount of polyol by multiplying the pounds of prepolymer by a factor which shows the quantity of polyol in the prepolymer. (D.I. 34A at A–36.)

On February 29, 1980, Dow sent an activity report to Witco covering the second half of 1979. (D.I. 34A at A–36.) On October 13, 1980, Witco sent to Dow another letter stating that the Agreement had been terminated. Witco stated that no royalty report had been received for the first half of 1980. As the letter stated, "[a]ccordingly, you have acknowledged that the said Agreement has been and is terminated." (D.I. 34A at A–37.) Dow responded on October 27, claiming inadvertence because its reporting procedures were still set up on an annual reporting rather than a semiannual reporting basis, as modified by letter agreement. Dow apologized for the delay and correctly stated that under the Agreement it had sixty days after the October 13 notice to correct the deficiency. The letter also rejected Witco's "acknowledgment" of the termination and repeated Dow's statement in its December 12, 1979 letter that there was no basis for the termination. (D.I. 34A at A–39.) Dow sent this letter on October 30, well within the sixty-day period, reporting activity for the first half of 1980. (*Id.* at A–39a.)

Witco responded to Dow's letter of October 27 on November 18, 1980, again claiming termination of the Agreement. Witco's complaints essentially repeated those of its November 28, 1979 letter: (1) no reports had been made concerning the number of pounds of polyols *used* by Dow; and (2) the type and kinds of records maintained by Dow were inadequate. Witco claimed that

---

**9.** Witco first attempted to terminate the Agreement at this time. However, Dow was given notice of these particular deficiencies only at this time and, by the terms of the Agreement, had sixty days to correct or explain them, which it subsequently did.

it received no reply to its request for an explanation of the recordkeeping. (D.I. 34A at A–40.)[10] Again, Witco claimed that the License Agreement had been terminated. (*Id.* at A–41.)

Dow responded on November 25, 1980, stating that the terms of the Agreement do not require reporting of the polyols *used* by Dow separately from those *sold* by Dow nor do they require disclosure to the licensor of the form or manner of its accounting practices. Dow also stated that under the Agreement Witco was entitled to have a CPA examine records at Dow for the purpose of determining the proficiency of Dow's royalty reports, and that beyond that Dow had no obligation to tell Witco how its records are kept. Again, Dow rejected Witco's position that the License Agreement had been terminated. (D.I. 34A at A–42.) In response, Witco again claimed that the Agreement had been terminated in a letter of December 22, 1980. Specifically, Witco contended that Dow had received notice of its breach and had failed to cure this breach within the time required. Witco continued to claim that Dow's royalty reports were "incomplete and misleading," referring to the use of sales figures rather than use figures. (D.I. 34A at A–43.)

ANALYSIS

### A. *Summary Judgment on the Issue of Termination*

The sole issue in this case is whether summary judgment is appropriate for the defendant on the issue of whether the Agreement is still in full force and effect. In order to obtain summary judgment, a moving party must demonstrate that there is no genuine issue as to any material fact and is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). In deciding whether to grant summary judgment, the Court must draw all inferences from the existing record in a light most favorable to the non-moving party. *Goodman v. Mead*

*Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1975), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Although it is true that the moving party bears the initial burden on this motion, the non-moving party bears the burden of producing material evidence in support of its allegations and must establish specific facts showing the existence of a "genuine issue for trial." Fed.R.Civ.P. 56(e).

### B. *Witco's Purported Termination of License Agreement*

Witco offers several arguments to support its contention that it properly effected termination and that at the very least, there are factual issues which should be addressed in a trial on this issue.

Witco's motivations are transparent for claiming that it properly terminated the Agreement: the patent had become too profitable to license to Dow and the three other companies under the present terms. Witco apparently decided at some point that the potential profit from a renegotiated, higher rate outweighed the risk of costly litigation. For example, Witco sent the same initial notice letter to Mobay (word for word) (D.I. 34 at 9) *on the same day* that it sent it to Dow, stating that the licensee had "breached" the Agreement and that the Agreement was therefore terminated.

Witco contends that its allegation that Dow materially breached the License Agreement requires a factual inquiry into the meaning of the Agreement and the scope of the patent claims. (D.I. 38 at 4.) The License Agreement is sufficiently clear concerning what both parties were required to do—particularly when a dispute arose. Section 7(c) explicitly states the *four* major obligations of Dow under the Agreement and the procedure Witco should follow when it believes that Dow is not properly fulfilling one of its obligations. (D.I. 15A at A–3.) Witco first must give notice of

---

**10.** Here, again the evidence of record shows otherwise. As already stated above, Dow replied within sixty days, reporting on polyols used or sold for use and giving an adequate explanation of how it arrived at this figure. (D.I. 34A at A–36.)

the deficiency, which may relate *only* to one or more of the *four* obligations.

Section 7(c) is the critical language of the Agreement which is at issue here. Witco focuses most of its complaints on the alleged inaccuracy of Dow's recordkeeping. Arguably, the meaning of the requirement to "keep accurate records," which Witco in several respects contends is a critical material issue in this case, is open to interpretation. The other three requirements—to make payment of royalties, to render any report, or to permit examination of the records—are sufficiently clear in meaning.

Nevertheless, for two major reasons, the meaning of "to keep accurate records" does not present a factual problem. First, it is not in any event of crucial importance because another part of the Agreement renders sole reliance on this language unnecessary. Should Witco suspect the accuracy of Dow's records, Witco has the option under the Agreement to have a CPA examine Dow's records to determine the accuracy of the royalty reports. (D.I. 15A at A–3.) Particularly damning to Witco's case is the undisputed fact that it did not use this option to have a CPA examine Dow's royalty records if Witco sincerely disputed the accuracy of those reports. Indeed, allegations of underreporting, nonreporting, and misleading reporting form the substance of Witco's complaints. In a license agreement, concern about accuracy of royalty reports is natural. An efficient manner of alleviating this concern is to have some provision for a third party to check the report's accuracy. It is true that failure within sixty days' notice of a deficiency in keeping "accurate" records would be a breach of the Agreement—a notice which Witco did give to Dow—but this provision must be read together with Witco's option to employ a CPA. Both terms of the Agreement are contained in the same paragraph. (D.I. 15A, ¶ 4.)

Thus, it is apparent that the parties contemplated that the accuracy of the royalty records could be a potential problem; and

that therefore the parties instituted a monitoring procedure that would act as a safeguard for the licensor's interests. This is both explicit and implicit in the Agreement.

Second, Section 4 clarifies the meaning of this language in requiring Dow to "keep records in sufficient detail to permit an accurate determination of royalties." (D.I. 34A at A–3.) This language appears to be clear, although Witco attempts to impute meaning that is foreign to the fair import of this section.[11]

There is no question that Dow's *method* of reporting under the Agreement is accurate. Witco complains that Dow only reported sales data and not the amounts *used* in its production process. However, this argument proves nothing since Dow states that it quite simply obtained the amount of polyol *used or sold for use* (in the terms of the License Agreement) by multiplying the amount of prepolymer it produced from the polyol by a certain factor. Dow did not use any of the prepolymer but sold all of it. The Court is convinced that use of the sales figure in this fashion is thus keeping records "in sufficient detail" as required by the Agreement. Dow could not have reported the polyols otherwise; it did not keep a production record of polyols and was not required to by the Agreement. Moreover, although Witco makes much of this "mysterious" factor applied by Dow, Witco never had a CPA examine the records to determine how Dow used it in its calculations.

Witco also contends that Dow did not report on sales of products using polyols during the period 1974–79. Dow reported there were no sales during this period; but Witco offers no positive evidence that such sales occurred in violation of the Agreement. Witco offers the deposition testimony by Dow officials and engineers (D.I. 38 at 15–16), who had no personal knowledge of sales during the period in question, and offers only sales brochures (D.I. 38A, Ex. 3) as evidence, no facts or figures.

---

11. Witco argues that Dow is required to maintain production records of the amount of po-

lyols (D.I. 38 at 12–13) despite the total absence of any such requirement in the Agreement.

In this connection Witco refers specifically to two portions of deposition testimony in addition to the sales brochures. First, Douglas Kunnemann, a product marketing manager for Dow, in response to questions whether Dow sold any other rigid polyols, stated that the only sales data he had personally looked at were in 1978—an "overview" of a sales report that reviewed just one specific product. (D.I. 34A, Ex. 2 at 20.) Second, Witco points to a colloquy by counsel in which Ms. Graham, an attorney for Dow, stated: "You did ask that we search for any other forms of sales data that might exist, and what we will do is agree that, for purposes of our summary judgment motion, the amount of polyols sold by Dow for use in rigid foams is significant. In other words, we won't assert as a defense to termination that the amount of those polyols is insubstantial." (*Id.*, Ex. 21 at 3.) Ms. Graham makes no specific reference to the time period here, nor does she specify whether the products were covered by the Agreement.

All of this, however, is immaterial because the Court agrees substantially with Dow's narrow framing of the issue relating to the notice letter of September 17, 1979. Although the Court finds subsequent letters of notice, which complained of accuracy of reporting concerning the polyols used or sold for use, to be material, Witco's complaints concerning reporting from 1974–1979 were never formally incorporated into a letter notice. This was a bare minimum required to set the process of termination in motion under the terms of the Agreement.

Witco further contends that the issue of whether it terminated the Agreement in accordance with the provisions is a question of fact. (D.I. 38 at 4.) However, it appears that the correspondence as well as the license provisions speak for themselves. *Before* determining that certain issues are to be tested in court for credibility, it must be determined that these issues are disputable issues of fact. Here, the correspondence shows the procedural history of the dispute, and the undisputed facts thus determined can be interpreted according to the provisions of the Agreement. Witco attempts to generate a smoke screen by contending that the correspondence shows that Dow was not reporting accurately, yet never followed the procedure stipulated in the Agreement for termination in addressing that concern.

As indicated before, Dow seeks to limit the issue of termination solely to consideration of the language in the September 17, 1979 letter of notice. The Court is in general agreement with Dow's approach to interpretation of the correspondence between the parties and rejects Witco's attempt to inject broad factual issues relating to patent infringement and alleged deficiencies in Dow's reporting system into what is simply an inquiry into the procedure for termination which is unambiguous in its terms. Nevertheless, Dow is incorrect in singling out Witco's September 17, 1979 letter to the exclusion of Witco's other correspondence discussed above.

The record shows that in all cases Dow made reports on the amount of polyols used or sold for use.[12] The only deficiency noted in the September 17 letter was Witco's complaint that, "We have not received any such (half-year) royalty reports." (D.I. 34A at A–32.) Dow quickly corrected this oversight. The only other deficiencies alluded to in Witco's letters of notice on November 28, 1979, November 18, 1980, and December 22, 1980,[13] concerned alleged

---

**12.** As already stated, technically, Dow did not file and report for the second half of 1974, during which time the '374 patent was issued. However, Witco never sent a notice directed to this deficiency, as required by the Agreement, and in any event Dow corrected this deficiency on May 12, 1976, when it reported no activity "[t]o the present." (D.I. 34A at A–25.) Further, the letter amendment to the Agreement permitting annual instead of biannual reporting until activity occurred, which was made after Dow's omission for the second half of 1974, superseded Dow's obligation in this instance, since there was no activity at that time.

**13.** The only other letter notice, dated October 13, 1980, concerned solely the absence of a biannual report for the first half of 1980 (D.I.

inaccuracies in reporting. Dow, however, gave Witco a full report of its reporting method. The burden was then on Witco to check Dow's records through the services of an independent CPA as the Agreement provided.

■ The Court thus finds that the Agreement between Dow and Witco has not been terminated and remains in full force and effect. The claims of patent infringement raised by Witco cannot be reached because the Agreement grants a license to Dow and its subsidiaries with the right to grant immunity to their customers.

If Witco believes that Dow has underreported the royalties due to Witco under the Agreement, then Witco must pursue its remedy in a forum (not this Court) which has jurisdiction over that issue.

Summary judgment will be entered in favor of Dow and against Witco for the above reasons.

34A at A–37), which Dow quickly sent to Witco on October 30, 1980. (*Id.* at A–39a.)